IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

DSM IP ASSETS, B.V. & DSM BIO-BASED
PRODUCTS & SERVICES, B.V.,

        Plaintiffs and Counter-Defendants

        v.

LALLEMAND SPECIALTIES, INC. &
MASCOMA LLC,

        Defendants and Counterclaimants.

OPINION & ORDER

16-cv-497-wmc

Having already addressed the parties' motions in limine, the court issues the following opinion and order on defendants' *Daubert* motions.

OPINION

**I. Lallemand's Motion to Exclude Opinions of Hal Alper, Ph.D. (dkt. #190)**

Lallemand seeks to exclude two general types of opinions offered by Professor Alper: (1) "opinions on the state of mind, intent, and motives of Lallemand"; and (2) "opinions concerning the availability and acceptability of non-infringing alternatives" under Rule 702. (Dkt. #190 at 5.) DSM opposes the motion. In applying Rule 702, a district court is to function as a "gatekeeper," determining whether a party's proffered expert testimony is relevant and reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993); *see also United States v. Johnsted*, 30 F. Supp. 3d 814, 816 (W.D. Wis. 2013) (expert testimony must be "not only relevant, but reliable"). Although "liberally admissible under the Federal Rules of Evidence," *Lyman v. St. Jude Med. S.C., Inc.*, 580 F. Supp. 2d 719, 723 (E.D. Wis. 2008), expert testimony must satisfy the following three-part test:

> [1] the witness must be qualified "as an expert by knowledge, skill, experience, training, or education," Fed. R. Evid. 702; [2] the expert's reasoning or methodology underlying the testimony must be scientifically reliable, *Daubert*, 509 U.S. at 592-93; and [3] the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702.

*Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007).

While "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence," *Daubert*, 509 U.S. at 596, an expert cannot offer an opinion on a party's intent because the expert can only render such an opinion "by drawing inferences from the evidence" and experts are not "any more qualified than an ordinary juror to draw those inferences." *See Dahlin v. Evangelical Child and Family Agency*, No. 01 C 1182, 2002 WL 31834881, at *3 (N.D. Ill. Dec. 18, 2002). Likewise, it is improper for an expert to offer opinions inconsistent with the appropriate legal standard. *See Wis. Res. Prot. Council v. Flambeau Mining Co.*, No. 11-cv-45-bbc, 2012 WL 12996210, at *2 (W.D. Wis. May 17, 2012) ("experts may not offer opinions about the applicable legal standards" since that "is the court's job").

Here, Lallemand seeks to exclude some of Alper's opinions because he has "no specialized knowledge or expertise to render these conclusions," and they "are beyond the bounds of permissible expert testimony." (Dkt. #190 at 5; *id.* at 11 (identifying ¶¶ 131, 135-36 of Alper's initial report and ¶¶ 112, 149, 171, 192, 220, 227, 229, 231 of his

substitute report).)[1]  Specifically, Lallemand seeks to exclude Alper's conclusion that "Lallemand copied the '998 Technology" (dkt. #146 ¶¶ 171-73, 227, 231; dkt. #45 ¶¶ 133-39) as based solely on Alper's "reading of documents in this case," which is something for which he does not have specialized expertise (dkt. #190 at 10.)  Lallemand also seeks to exclude opinions about willful infringement to which Alper testified at his deposition, contending they "are improper legal conclusions." (*See id.* at 10-11.)

As noted, DSM opposes the motion, specifically noting that Alper provided no opinions about Lallemand's intent.  As to paragraph 149, DSM explains that Alper's opinion is premised on Professor Winge ordering additional testing -- instead of relying on Lallemand's original Blomberg assay testing -- which "to a scientist" demonstrates that both the "original testing was of poor quality and unreliable" and the original tester lacked an understanding of how to use the Blomberg assay.  (Dkt. #214 at 5-6.)  Accordingly, DSM contends that Alper's opinion is about how a *scientist* would interpret the reliability of Lallemand's testing, making it admissible.  (*Id.* at 6.)  While not excludable under *Daubert*, the court is concerned about the relevance of this opinion, both because lack of scientific sophistication is not evidence of willfulness and, if anything, DSM is *relying* on the original tests to prove infringement, making subsequent criticism to prove willfulness disingenuous at best.  Accordingly, the court will RESERVE on the admissibility of this

---

[1] DSM "agree[s] to strike the language 'in a scheme to obtain artificial data to support its noninfringement position' from Paragraph 112 of Dr. Alper's report." (Dkt. #214 at 5.)  However, as noted previously, expert reports are themselves inadmissible hearsay, so this portion of defendants' motion is DENIED AS MOOT.

opinion pending a further proffer by plaintiff.[2]

As to paragraph 192, DSM again defends Alper's opinions about Lallemand's Blomberg testing -- that a double-knockout strain exhibiting the highest GPD activity "indicates a fundamental error in the experimental setup," while its delay in providing that result "demonstrates that Lallemand's actions are scientifically unethical and contrary to the norms used by scientists in reaching conclusions based on data and in reporting results," so that it did not meet "basic scientific standards." (*Id.* at 7-8.) DSM contends Alper is qualified to offer these opinions because he is an editor of peer-reviewed scientific journals and a scientist (*id.* at 8), but it again fails to explain why this is a relevant standard for proving Lallemand's willfulness or how it purports to be consistent with DSM's proof of infringement. Regardless, the court agrees that these additional opinions are inflammatory and unfairly prejudicial. Accordingly, those opinions in paragraph 192 are STRUCK from his report and Alper shall not render them at trial, including that "Lallemand *purposefully concealed* a critical piece of information from DSM." (See dkt. #146 ¶ 192 (emphasis added).)

In paragraphs 131 and 135-136 of Alper's invalidity report, Lallemand challenges his opinion that it "desire[d] to obtain rights to use the '998 technology" based on Lallemand's "long know[ledge]" of the '998 patent's relevance stemming from the February

---

[2] The court notes that while Alper may, under certain circumstances, be able to opine about the conclusions a scientist might reasonably draw from another scientist (in this case, Professor Winge) ordering repeat testing, subject to plaintiffs establishing relevance, he cannot "opine" (really argue) that "Winge appears to admit [the original testing was performed by a person who] does not have a basic understanding of proper procedures for conducting enzymatic activity assays and data analyses." (*See* dkt. #146 ¶ 149.)

2011 agenda (dkt. #45 ¶ 131), which has already been excluded (*see* dkt. #228 § II.K), as well as opinions that Lallemand copied the '998 patent's technology "with full knowledge" (dkt. #45 at ¶ 136, *see also id.* ¶ 135).  In response, DSM contends that Alper "relies on Lallemand's knowledge of the '998 patent as well as its admitted relevance to Lallemand's product line [or statements by Lallemand employees] as evidence of a nexus between the claims of the '998 patent and [either] Lallemand's inquiry into licensing the '998 patent [or Lallemand's copying]."  (Dkt. #214 at 9.)  Experts, DSM argues, analyze documents.  (*Id.*)  Again, the court disagrees.  Alper's opinions as to Lallemand's desires, purportedly distilled through the review of documents, improperly invades the province of the jury because an expert witness is no more qualified than a lay juror to infer such desires.  Accordingly, these opinions are also STRUCK and Alper will not be able to offer them at trial.

As to paragraphs 220, 227, and 229 of Alper's substitute report, he opines that (1) "*with full knowledge*, Lallemand incorporated the claimed technology in its TransFerm Yield+ product"; (2) "*Lallemand was aware of DSM's glycerol reduction technology as early as December 2009 and the '998 patent as early as 2013.  Despite this knowledge*, Lallemand copied the claimed technology"; (4) "Lallemand never attempted to commercialize [acceptable design-around strategies] prior to its mid-2016 launch of the YP3 product *despite its knowledge of the '998 patent*"; and (5) "Lallemand maintained the claimed acetylating acetaldehyde dehydrogenase activity in its recently developed YP3 product *despite its*

5

*knowledge of the '998 patent and the threat of this pending litigation.*" (Dkt. #146 ¶¶ 220,[3] 227, 229 (emphasis added).) Ignoring for the moment that this reads like closing argument, written by counsel, not a scientist, DSM contends that paragraphs 220, 227, and 229 concern whether there were available and acceptable noninfringing alternatives that would factor into the hypothetical negotiation: specifically, Lallemand knew about the patent, its relevance to Lallemand's products, and DSM's infringement claim, yet incorporated the technology into YP3, rather than develop an alternative. Accordingly, Alper purports to find support for his opinion that strain M8827 was neither acceptable nor available. (Dkt. #214 at 11.) Even accepting this explanation, each of these italicized "opinions" would further invade the jury's role as to Lallemand's state of mind. Alper is no more skilled than a lay juror to determine Lallemand's desires and knowledge. Thus, these opinions are also STRUCK and will not be rendered to the jury.

DSM defends paragraphs 171-73 and 231 of Alper's infringement report as a direct response to Professor Winge's opinion that: "the Accused Products do not require the presence of acetate. In fact, they were engineered without consideration of acetate consumption (at least beyond the level that wild-type yeast cells consume acetate)." (Dkt. #214 at 10 (quoting (dkt. #51 ¶ 91).) The court generally agrees that these opinions are appropriate and directly respond to Winge's opinion. An exception, however, is Alper's opinion that "[w]ithin a week of its publication, Lallemand was . . . aware of Medina's combination of acetate consumption and glycerol reduction technologies" (dkt. #146 at ¶

---

[3] As noted, the court already excluded the February 2011 agenda and has also addressed Alper's opinion that "Lallemand has admittedly not genuinely pursued any strategies to design around the '998 patent to date" based on the statements of counsel. (*See* dkt. #228 §§ II.K, II.O.)

172), which is improper for the same reasons discussed above.

Turning to the challenge to Alper's opinion that there are no available, acceptable and non-infringing alternatives, Lallemand argues that he: (1) makes that determination at the wrong time; (2) "concocts a standard for acceptability for which he has no qualifications and no evidentiary support" to render this opinion, making his dismissal of the M8827 strain *ipse dixit*; (3) lacks qualifications to opine about the availability of these alternative strains; and (4) improperly relies on market data. (Dkt. #190 at 11-12.) As to timing, Lallemand argues that Alper's consideration of products available throughout the period of infringement, including at the time of trial, is "fatal" because "the key question is how alternatives might impact the parties' bargaining position," so that availability at the time of the hypothetical negotiation is what matters. (*Id.* at 12-13.) This error is particularly egregious, Lallemand contends, because Alper compared Lallemand's alternatives to Firestart, which was not conceptualized until 2015 and not in pilot-scale trials until late 2017. (*Id.* at 14 & n.6.)

In response, DSM contends that Lallemand attempts to hold Alper to a different standard than Professor Winge or Mr. Green, each of whom consider and opine on strain M8827, which was only a developmental strain in August 2014 (the start of alleged infringement, and therefore the appropriate date for a hypothetical negotiation). DSM argues that Dr. Alper should at least be able to opine that in August 2014, strain M8827 still required months or years to commercialize, making it unavailable and unacceptable at the time of the hypothetical negotiation. (Dkt. #214 at 19.) Further, DSM appears to argue that evidence postdating the hypothetical negotiation can be relevant to corroborate

7

the hurdles that remained before introduction of this new strain in the market. (*Id.*)

As an initial matter, a noninfringing alternative need not be available at the time of the hypothetical negotiation, because the infringer "would [still] have been in a stronger position to negotiate a lower royalty rate knowing it has a competitive noninfringing device 'in the wings.'" *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1571-72 (Fed. Cir. 1996). This is why Lallemand's development strain M8827 is relevant -- it existed and could have been in development at the time of the hypothetical negotiation -- unlike Firestart which was not conceptualized until 2015.[4] Accordingly, subject to Lallemand opening the door, Professor Alper will not be able to opine about Firestart, including comparing Lallemand's proposed noninfringing alternatives to it, but he may respond to opinions by defendants' expert as to the *scientific* viability of strain M8827 at the time of the hypothetical negotiation. Absent a proffer as to their background and experience, however, neither Professors Winge nor Alper will opine on whether strain M8827 is *commercially* viable.

Next, Lallemand challenges Alper's acceptability opinion, which Lallemand criticizes for "assum[ing] that non-infringing alternatives will only be acceptable if they result in enhanced ethanol yield equivalent to that demonstrated by the Accused Products" or meet the performance of the highest ethanol-producing yeast available, making none of the alternatives acceptable. (Dkt. #190 at 15-16.) Lallemand argues that the appropriate question is: in a world where the Accused Products do not exist, what is the next-best

---

[4] As noted in the court's motions in limine opinion, in its proposed reply, Lallemand "agree[d] to limit its non-infringing alternatives to conventional yeast, strain M8827, and TransFerm," so that "DSM cannot complain that Lallemand is relying on evidence relating to strains existing only after the date of the hypothetical negotiation." (Dkt. #225-3 at 4 n.2.)

8

alternative? (*Id.* at 15.) Because Alper is not an economist, Lallemand adds that he lacks qualifications to opine on consumer demand or market forces, and he does not know enough about the ethanol-producing yeast market to opine on that market. (*Id.* at 16-18.) In response, DSM criticizes Lallemand for mischaracterizing Alper's opinions, explaining that his opinion is based on two facts: (1) no bioethanol producer would find strain M8827 acceptable without data from industrial-scale trials; and (2) these strains would not be acceptable because DSM's Firestart outperformed them in terms of glycerol reduction and ethanol yield increase. (Dkt. #214 at 18.) Likewise, DSM contends that Alper properly determined that these developmental strains "would significantly underperform DSM's FS0130 strain in ethanol production and therefore would not be acceptable alternatives," because Firestart is presently commercially available. (*Id.* at 20.)[5] As the court has already explained, strain M8827, unlike Firestart, is relevant because it was at least conceptualized at the time of the hypothetical negotiation in August 2014. Accordingly, comparisons to Firestart are irrelevant. As to whether a bioethanol producer would find M8827 acceptable, that is a question of fact for the jury, on which Alper's scientific opinion -- subject to cross-examination -- may be helpful. Again, absent an appropriate proffer, however, the court agrees neither Winge nor Alper is qualified to render opinions on the commercial viability of any product, much less one only in the concept stage.

Lallemand also argues that Alper "lacks qualifications to render an independent

---

[5] DSM argues that "[t]o the extent the Court deems alternatives commercially developed after August 2014 to be outside the scope of the hypothetical negotiation, the Court should also exclude Dr. Winge's and Mr. Green's speculative opinions regarding strains M8827 and M13021, neither of which have been shown to be commercially viable even today." (Dkt. #214 at 21.)

9

opinion on Lallemand's ability to produce and, thus, the availability of non-infringing alternatives." (Dkt. #190 at 18.) First, Lallemand argues Alper bases his availability opinion on its inability to "scale-up production or switch its customers to these product," but he is not an economist, lacks knowledge of the relevant market, and has never worked on generating a yeast for the fuel ethanol market, making his opinion based on an interpretation of Lallemand documents and testimony. (*Id.* at 19-20.) DSM responds contending that Lallemand "mischaracterizes" the basis for Alper's opinion, asserting that he relied on the testimony of a Lallemand employee that it takes "an enormous amount of work" to bring a new product to market and acknowledging a "preference to not make any changes to the existing technology because we have to then start the learning curve over again." (Dkt. #214 at 14 (quoting dkt. #146 ¶ 253).) Alper explains further that the only available information about M8827's capabilities comes from laboratory testing, noting the unpredictable scaled-up performance, which showed this strain was not available. (*Id.* at 15-16.) DSM adds that Lallemand's criticism that Alper is unqualified to offer economic opinions is further mischaracterization because he is not offering economic opinions, but rather considers the typically months-long process from scaling laboratory testing to industrial-scale testing, something he is qualified to opine about as a chemical engineer. (*Id.* at 17.) Assuming a foundation is proffered to establish Alper's experience in "scaling up" from laboratory to industrial testing, he may so opine.

Lallemand next contends that Alper's opinions referencing Lallemand's behavior in the actual market are irrelevant because the Accused Products exist, so Lallemand's decision not to commercialize strain M8827 "says nothing about the availability of

10

alternatives." (Dkt. #190 at 20-21.) DSM responds that this criticism "misses the point," asserting that in the development of YP3, Lallemand knew about the Accused Products' better performance compared to M8827, as well as DSM's infringement claim, yet proceeded to launch YP3 anyway, which is relevant to whether the developmental strains were acceptable and to calculating a reasonable royalty. (Dkt. #214 at 16-17.) While Alper, as a chemical engineer, *may* be able to provide helpful testimony to the jury about the bioethanol market and transitioning from one yeast strain to another, assuming a proper foundation is proffered, but the court agrees that most of this other opinion is argument that should be left to counsel in closing.

Accordingly, Lallemand's motion to exclude Alper's opinions) is GRANTED IN PART AND DENIED IN PART.

## II. Lallemand's Motion to Exclude Expert Testimony and Opinions of Jesse David, Ph.D. (dkt. #189)

Lallemand seeks to exclude DSM's damages expert Jesse David, Ph.D., on the basis that his reasonable royalty opinion is not sufficiently reliable to be admissible. *See* § I, *supra*. Lallemand raises three core challenges to David's report: (1) the 50/50 split on which he relies as a starting point is an impermissible "rule of thumb"; (2) David failed to apportion damages to the patented technology; and (3) David misapplied some of the *Georgia Pacific* factors. The court will address each challenge in turn.

*First*, Lallemand critiques David for relying on "[a] large body of economic literature" to conclude that "each party to a negotiation over an asset of known value is likely to receive an approximately equal share of the amount being bargained over,

11

regardless of which party holds initial ownership of the asset." (Dkt. #149 ¶ 55.) Lallemand describes this approach as the "Nash Bargaining Solution" and represents that it is an impermissible "rule of thumb," citing *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011), and *Virnetx, Inc. v. CISCO Systems, Inc.*, 767 F.3d 1308 (Fed. Cir. 2014). (Dkt. #189 at 12.) In *Uniloc*, the Federal Circuit explained that parties may not rely on a profit-splitting rule of thumb, even as a starting point, unless based on "the portion of profit that may be customarily allowed in the particular business for the use of the invention or similar inventions." 632 F.3d at 1317. More recently, in *Virnetx*, the Federal Circuit rejected "invocations of the Nash theorem without sufficiently establishing that the premises of the theorem actually apply to the facts of the case at hand," labeling such attempts as an "inappropriate 'rule of thumb.'" 767 F.3d at 1332. As plaintiff argues, however, the court did not hold that the 50/50 split of incremental profits was *per se* unreliable; rather, the court held that "[a]nyone seeking to invoke the theorem as applicable to a particular situation must establish that fit." *Id.*

The next several paragraphs of David's report purports to provide that tie, or at least is enough of a tie to rebut sufficiently Lallemand's motion to exclude his testimony. *See Wis. Alumni Research Found. v. Apple, Inc.*, 135 F. Supp. 3d 865, 885-86 (W.D. Wis. 2017) (rejecting similar challenge to expert testimony, finding 50% profit split sufficiently tied to the facts of the case). Specifically, David relies on: (1) Mascoma and Lallemand's negotiations between 2011 and 2014, eventually settling on a 50/50 split; (2) other negotiations and agreements with Lallemand customers describing a similar profit sharing plan, with splits ranging from 25 to 50 percent for Lallemand; and (3) DSM's evaluation

12

of its own business prospects, including a license with DuPont, proposing 35% of DuPont's gross revenues (rather than profits). (Dkt. #149 ¶¶56-59.) Lallemand, of course, is free to cross-examine David on the factual underpinning for his assumed 50/50 split based on the factual differences in the other examples upon which David purports to rely, as well as present their own experts' testimony that a 25/75 split is more appropriate, but the court finds no reason to strike David's testimony under *Uniloc* and *Virnetx*.

*Second*, Lallemand challenges David's failure to separate or apportion those profits derived from the patented features, as opposed to the unpatented features. *See Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018) ("The essential requirement is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention add to the product."). As Lallemand explains, its pricing of the Accused Products -- TransFerm Yield+ and TransFerm YP3 -- consist of two components beyond the price for the yeast itself: (1) the technology fee (also referred to as "MGT" for Mascoma Grain Technology) for the reduced need for glucoamylase enzymes; and (2) the technology or MGT fee for the benefit of increased ethanol yield. (Dkt. #189 at 8-9, 19.) Lallemand asserts that the Accused Products contain both of these technological improvements, while Lallemand's other product, TransFerm, only contains the first modification reducing the amount of glucoamylase. (*Id.* at 8.) And, of course, conventional yeast does not contain either modification. Accordingly, Lallemand criticizes David for using the entire stack of pricing components, arguing that he should instead have included only profits associated with MGT fees for the benefit of increased ethanol yield.

In its response, DSM explains that if the patented improvement "generates new sales of the Accused Products, those necessarily would benefit Lallemand in both the yeast and MGT components, and it is therefore proper to consider both components in assessing the value of the '998 patent." (Dkt. #213 at 10.) In other words, David's approach of calculating the incremental profits as being equal to "Lallemand's actual incremental profits earned on [the Accused Products] less the profits Lallemand would have earned if it had continued selling only TransFerm and conventional yeast" properly apportions the profits as required. (*Id.* (citing dkt. #149 at 42).) By using this method, David took into consideration both: "(1) the profits derived from the increased yeast sales (*i.e.*, the yeast component) of the Accused Products over TransFerm and conventional yeast, and (2) the increased MGT fees collected for the Accused Products over TransFerm." (*Id.*)

Assuming DSM can *prove* to the jury's satisfaction that none of these additional sales would have been made by Lallemand anyway -- something Lallemand obviously disputes -- the court agrees that David's approach to apportioning the profits serving as the royalty base to the patented components of the accused products makes sense, or at least, the approach is sufficiently reliable for David to render it. Here, too, Lallemand remains free to cross-examine David about his approach, and, in particular, question him as to his apparent differential treatment of Lallemand customers (POET versus non-POET customers), but these challenges go to the weight the jury may assign David's testimony,

not its admissibility.[6]

*Third*, and finally, Lallemand challenges David's treatment of two of the factors under *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), and David's adjustment, based on these factors, of the 50% split to a 40% to 50% profit allocation to DSM. In particular, Lallemand takes issue with David's conclusion that DSM and Lallemand would have viewed themselves as competitors at the time of the hypothetical negotiation. In support, Lallemand points to David's deposition testimony, in which he admitted that DSM had not sold *and* did not have plans to sell yeast products in 2014. (Dkt. #189 at 24.) Lallemand's argument, however, is too clever by half. As DSM points out in its response, Lallemand's expert concedes that DSM began developing a yeast product for first-generation bioethanol producers shortly after the hypothetical negotiation. (Dkt. #213 at 17.) Moreover, David properly considered this fact, under the "book of wisdom" framework, which permits experts to consider facts that come to light after the hypothetical negotiation *if* they were reasonably foreseeable. *See Fromson v. W. Litho Plate & Supply Co.*, 853 F.2d 1568, 1575 (Fed. Cir. 1988), *overruled on other grounds by Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337 (Fed. Cir. 2004) (explaining that the hypothetical negotiation analysis permits "flexibility because it speaks of negotiations as of the time infringement began, yet permits and often requires a court to look to events and facts that occurred thereafter and that could not have been

---

[6] Of course, if David has not done his own calculation breaking out the portion of profit attributable to increased ethanol yield, then the jury will be left with only Lallemand's apportioning should he reject his assumption that all sales of the Accused Product would have gone to a competitor or not been made at all (i.e., no brand loyalty).

15

known to or predicted by the hypothesized negotiators"). Of course, Lallemand is free to challenge whether DSM reasonably viewed itself or was viewed by Lallemand as a competitor at the time of the hypothetical negotiation for purposes of considering the *Georgia Pacific* factors for the very reasons it stresses in its *Daubert* motion.

Lallemand next challenges David's conclusion that there were no non-infringing alternatives, another *Georgia Pacific* factor, arguing that David's opinion rests on that of another expert, Dr. Alper, whose opinion of what constitutes a non-infringing alternative is too narrow. In response, DSM first challenges Lallemand's characterization of David's opinion, arguing instead that David acknowledged Lallemand's TransFerm and conventional yeast products are non-infringing and assumes that Lallemand would sell those products in the place of the Accused Products. (Dkt. #213 at 18 (citing dkt. #149 ¶¶ 41, 94).) Moreover, it is entirely appropriate for an expert to rely on the opinions of other experts. *See Wis. Alumni Research Found.*, 135 F. Supp. 3d at 891 ("[A]n expert's testimony is not improper simply because the expert relied on the opinions of other experts. Rather, it is dependent on the persuasiveness and reliability of those other experts."). Of course, to the extent this court has struck portions of Alper's conclusions about certain developmental strains not being known on the market, David may not rely on them, but this is not a basis to strike David's opinion altogether, especially in light of his treatment of Lallemand's other products as non-infringing alternatives, though admittedly, it may be a basis to question the strength of that opinion in cross-examination.

Finally, Lallemand challenges David's conclusion that the hypothetical negotiation would have resulted in the parties setting a royalty rate of 40% to 50% of incremental

profits. Lallemand contends that David fails to provide "any reason why he chose a 10% adjustment [range] rather than some much greater number." (Dkt. #189 at 22.) In support, Lallemand points to *Exmark Manufacturing*, 879 F.3d 1332, arguing that the case is on all fours with David's approach. In *Exmark Manufacturing,* the Federal Circuit affirmed the district court's exclusion of expert damages testimony, on the basis that the expert failed to tie her 5% reasonable royalty rate to the facts at issue in that case. *Id.* at 1349-50. Unlike here, the expert in that case provided no starting point from which she then adjusted the rate to reflect the *Georgia Pacific* factors. In contrast, David started with a 50/50 split tied to the facts of the case, and then adjusted that split *downward* to reflect certain factors. Lallemand may cross-examine David as to how and why he arrived at a departure of up to 10%, rather than some greater adjustment, but this criticism does not render David's testimony unreliable.

For all of these reasons, Lallemand's motion is DENIED.

ORDER

IT IS ORDERED that:

1) Lallemand's motion to exclude opinions of Professor Alper (dkt. #190) is GRANTED IN PART AND DENIED IN PART.

2) Lallemand's motion to exclude opinions of Dr. David (dkt. #189) is DENIED.

Entered this 25th day of April, 2018.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge